UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 4:22-cr-445-SRC |
| KYLE BRAY, | ) ) ) |
| Defendant. | ) ) |

**DEFENDANT'S SENTENCING MEMORANDUM**

As a young child, Kyle Bray was a victim of sexual abuse and exposed to graphic sexual acts. *See* Presentence Report ("PSR") ¶ 56. He had little support to lean on his family to deal with this trauma—Mr. Bray's father was physically and emotionally abusive to his mother. Exhibit A, attached (dictated letter by Donna O'Shei, Mr. Bray's mother). The abuse caused his mother to escape the family, leaving Mr. Bray behind in Missouri while she moved to Florida. *Id.* Mr. Bray's father continued to verbally abuse him and his brothers and eventually, Mr. Bray joined his mother in Florida where she began a new relationship. *See id.* This boyfriend, however, was not much better than Mr. Bray's biological father—he was an alcoholic who ended up sentenced to about a decade in prison for hitting a child while drunk driving.

This childhood damaged him. As research shows, "[a] high percentage of adolescents with sexually abusive behavior have been found to have a history of childhood sexual abuse."[1] That high percentage includes Mr. Bray. At 14 years old,

---

[1] Rusan Lateef and Angelique Jenney, *Understanding Sexually Victimized Male Adolescents with Sexually Abusive Behaviors: A Narrative Review and Clinical*

the Juvenile Division Circuit Court in Martin County, Florida juvenilely adjudicated Mr. Bray delinquent for sexual battery of a child when he was 11 years old and molestation of a child when he was 13 years old.

Initially, Mr. Bray's "cognitive limitations and mental maturity," rendered him incompetent for the state to proceed on the adjudications pursuant to an August 2003 judicial order. Exhibit B, attached, at pp. 1-2 (Order Adjudging the Child Incompetent). This finding was based on evaluations from two mental health experts, which both found him incompetent. *Id.* One of those experts, Dr. Steven Edney, a psychologist, stressed it was "apparent that Kyle has significant and severe intellectual limitations." Exhibit C, attached (excerpt of Florida Department of Juvenile Justice records) (finding Mr. Bray was "not aggressive or conduct disordered," but showed impulsivity and poor judgment).[2]

An October 2004 court-ordered forensic psychological evaluation likewise found Mr. Bray incompetent because he, in large part, functioned at a younger age mentally than his chronological age. Exhibit D, attached, at p. 4 (10/14/04 Forensic Psychological Evaluation Report). Mr. Bray, who was then 13 years old, had the "[m]ental [a]ge between 9½ and 11½ years[,] which is approximately 2 years below his current chronological age" according to his IQ and performance on various tests. *Id.* at p. 3 ("Kyle presents as a cognitively impaired youngster who experiences expressive language deficits.").

---

*Implications*, Sage Jr., Trauma, Violence & Abuse, Vol. 22(5) 1169-1180 (2020), https://journals.sagepub.com/doi/10.1177/1524838020906558 ("Multiple research studies have found a high prevalence of CSA [childhood sexual abuse] victimization among samples of adolescents with sexually abusive behaviors, up to 75% for male adolescents with sexually abusive behaviors in some studies.").

[2] Dr. Edney examined Mr. Bray in 2002, 2003 and twice in 2005. Ex. C.

At 11 years old, when the conduct underlying the first adjudication occurred, Mr. Bray's mental age was more akin to about a 7-year-old, or at most, a 9-year-old. The combination of Mr. Bray's younger, cognitively impaired mental state, his prior trauma, and chaotic homelife, helps explain and contextualize these adjudications.

**I.      A Sentence of 157 Months, the Low-End of Mr. Bray's Guidelines Range Minus 11 Months to Account for State Custody on Relevant Conduct, is Sufficient and Not Greater than Necessary**

**A.      A Sentence Greater Than 157 Months is Unnecessary Because Mr. Bray has Demonstrated he Can do Well With Strict Sex Offense Counseling and Supervision, Such as Federal Supervised Release**

Once he was deemed competent and adjudicated, Mr. Bray, starting at 14 years old, underwent intensive treatment in a residential facility for about two and a half years, and then further counseling and monitoring, which lasted until he was 19 years old. Mr. Bray excelled with treatment. For example, a November 2006 performance summary praised Mr. Bray as a "great inspiration to his unit." Exhibit E, attached, at p. 1 (Performance Summary). The review noted Mr. Bray, then 15 years old, "demonstrated signifigant growth" on his communication and social skills with peers and authority figures, he actively participated in his group sessions, and "remained respectful and honest with facility staff members." *Id.* For his behavioral development, he "benefited so much from his social skills groups and the encouragement he received from both staff and youth, that he receive[d] numerous positive marks on his behavior." *Id.* at p. 2.

Perhaps most significant, Mr. Bray was "very honest with his Case Manager and Mental Health Therapist concerning his committing charges and his thinking errors" and he attended all of his sex offense group and individual therapy sessions while being "open and honest" in his sessions. Ex. E at p. 2. He learned about "his

3

sex offen[s]e cycle, . . . triggers that lead to his offen[s]e," and he "expressed sincere empathy for his victims." *Id.*

Overall, he made "significant progress" adjusting to the program, "communicating his thoughts and feelings more expressively," and had "very positive and appropriate" interactions with staff while, in turn "gain[ing] self confidence and respect for himself." Ex. E at p. 3; *see also* Exhibit F, attached (May 22, 2007 Performance Summary) (demonstrating progress with all reported areas, including impulse control).

Mr. Bray then struggled, but by May 2008, he "remained on task" and demonstrated "better decision making" and "better choices on how to react to situations." Exhibit G, attached, at p. 1 (Performance Summary). Mr. Bray "put forth the effort[] into his progress [for his Individual Performance Plans] as he ha[d] in the past." *Id.* For the "entire time" he was involved with a group called "Impact of Crime," Mr. Bray showed positive behavior, as well as "remorse and empathy for his crime." *Id.* at p. 2 ("Resident Bray [is] making positive changes and continues to understand the effects of his crime."). Mr. Bray's interactions with staff were "very positive[,] . . . appropriate[, and] . . . respectful." *Id.* at p. 4. As he was beginning to transition out of the residential program, he had "gained a great deal of confidence in himself and [was] very proactive in his treatment teams." *Id.* at p. 3.

Later in 2008, Mr. Bray successfully completed his sex offender residential program. For several more years, Mr. Bray continued his out-patient treatment, actively participating and working hard on his goals. Specifically, an April 2009 progress report stressed:[3]

---

[3] Excerpt of Florida Department of Juvenile Justice records.

4

> Kyle participates actively in group discussions. He can identify cognitive distortions in himself and others. He supports appropriate decision-making and goals in others. Even though Kyle has limited cognitive ability, it is noted that from week to week, he remembers what is discussed in group, and he is able to apply what he has learned to some new situations. He has a consistently good attitude toward treatment.

He kept building on this work, sharing with another counselor in September 2010:[4]

> important major life events, some traumatic, beginning before age 4 being a victim of abuse

Mr. Bray, alongside his mother, were receptive to interventions and he agreed he:[5]

> needs meaning and pupose in his life and wants to work in treatment to obtain that goal.

Mr. Bray achieved those goals. In December 2010, at 19 years old, the state recommended terminating Mr. Bray's supervision, finding he "has done well since his release from" the in-patient residential center, he paid all court fees, completed his community service, successfully completed sex offender counseling, had employment, and was set to complete another sexual behavior problems treatment program later that month. Exhibit H, attached (Florida Department of Juvenile Justice Progress Report). Accordingly, the court terminated his supervision in January 2011. Exhibit I, attached (Order Terminating Supervision).

### B. Mr. Bray Can Do Well Following Court-Ordered Supervision Conditions Despite his Cognitive Impairments

Successfully completing years of treatment, which often came with assignments to write or orally express himself did not come easy for Mr. Bray. Since Kindergarten, Mr. Bray struggled with learning and cognitive functioning, as discussed above. *Supra* p. 2; Ex. D at p. 2 (noting Mr. Bray has been in special education classes since Kindergarten).

Throughout his schooling, Mr. Bray had Individual Educational Plans ("IEPs") with various diagnoses during these years ranging from an Exceptional Education

---

[4] Excerpt of Children's Hone Society of Florida records.

[5] *Id.*

Student to Educationally Mentally Handicapped ("EMH") to Mild Mental Retardation to Intellectually Disabled to, more recently, Borderline Intellectual Functioning.  PSR ¶ 62; Ex. D at p. 2; Exhibit J, attached, at p. 1 (May 2004 Martin County School Dist., Psycho-Educational Assessment) (noting placement for EMH); Exhibit K, attached, at p. 1 (excerpt of September 2009 Fort Zumwalt School Dist. records) ("Kyle is identified as a student with an intellectual disability"); Exhibit L, attached, at p. 2 (September 2023 Dr. Rod Hoevet, Intelligence Assessment and CV) ("Mr. Bray's overall functioning is within the Borderline range of intelligence").

In the Sixth Grade at 12 years old, Mr. Bray "exhibited significant weaknesses in all academic areas." Ex. J at p. 2.  Shockingly, "he [did] not know the entire alphabet." *Id.*  A couple of years later, at 16 years old, testing showed Mr. Bray scored "below [the] third[-]grade level in reading comprehension" and at the fourth-grade level for math.  Exhibit M, attached (excerpt of April 2008 Okeechobee County School Board IEP records).

Mr. Bray's counselors and sex offense treatment providers noted his intellectual limitations, but nevertheless stressed he worked hard to complete the assignments despite his impairments. *See supra* p. 4; *see also* Ex. C ("Given his cognitive limitations, he will have difficulty functioning in a Level 8 program.");[6] Ex. E at p. 1 ("The difficulties that Resident Bray has in his learning abilities and with his communications skills in the past, have not hindered his progress during this reporting period.") Ex. F at p. 1 ("He continues to show progress with his learning difficulties and communication problems.").

At 18 years old, his IEP evaluator was concerned that Mr. Bray's comprehension difficulties may impact his "ability to master new tasks in a work setting." Ex. K. As the IEP foreshadowed, his lower intellectual functioning did

---

[6] Mr. Bray was eventually placed in a Level 8 program.

impact his work.  For example, a May 2010 report noted that Mr. Bray required extra instruction at work and the "[q]uality of [his] work tended to drop off if the evaluator was not next [to] him."  Exhibit N, attached (excerpt of Fort Zumwalt School Dist. records).  While Mr. Bray had employment, he was chronically under-employed due to his cognitive deficiencies.  He worked as a dishwasher, a landscaper, and prior to his arrest, at U-Haul making about $11 an hour.  *See* PSR ¶¶ 72, 74.  But he has had difficulties handling much more than that type of low-pay work.

In September 2023, Dr. Rod Hoevet, a forensic psychologist, conducted an Intelligence Assessment on Mr. Bray to opine how his cognitive difficulties impair his employment prospects and impacts other daily tasks.  Ex. L.  After an in-person evaluation and a review of Mr. Brays records, including IEP reports, Dr. Hoevet found he is within the "Borderline range of intelligence," with testing placing him in the 2nd percentile.  *Id*. at p. 2.  Even more problematic is Mr. Bray's "working memory abilities (i.e. temporary retention of information in memory, and/or perform[ance of] mental operations or manipulat[ion of] that information)."  *Id.*  Compared to his age group, Mr. Bray fell into the "extremely low range"—0.3 percentile.  *Id*.

Because of Mr. Bray's extremely low functioning for working memory, Dr. Hoevet expects Mr. Bray to "struggle greatly in areas that require him to learn, retain, manipulate and then apply information he has learned."  Ex. L at p. 5.  And Mr. Bray has struggled to learn and utilize information within the workplace.  Employment that only involves simple tasks and/or repetitive manual labor has been basically the only type of work he has held down.  Because "[i]ntellectual ability is a significantly stable construct," *id*. at p. 3, Mr. Bray will continue to struggle with gaining higher paying or more challenging employment through his entire life.

Mr. Bray's chronic under-employment is a result of his well-documented and long-lasting mental impairments rather than laziness or an unwillingness to do more.  And given these mental deficits, it highlights even more so the efforts he devoted to

7

his treatment during his Florida adjudications. Because of his willingness to engage in treatment, despite his limitations, this Court does not need to sentence Mr. Bray beyond 157 months—he has shown he can abide by court-ordered conditions, such as the strict supervised release conditions, and fully engage in treatment once he is released. A sentence of 157 months is also more than sufficient, especially since Mr. Bray has never served any adult custody previously.

### C. This Court Should Honor the Parties' Joint Agreement to Vary Down by 11 Months to Account for Primary State Pre-Trial Custody for Relevant Conduct That the BOP Will Not Credit

The 157-month sentence reflects a low-end Guidelines sentence less 11 months to account for the time Mr. Bray served in primary state custody on relevant conduct, which the Bureau of Prisons will not credit. Specifically, the Lincoln County Sheriff's Office arrested Mr. Bray on May 24, 2022, PSR ¶ 22, and the next day, he transferred to the Franklin County Jail. Exhibit O, attached (Lincoln County Sheriff's Office Letter of Incarceration); Exhibit P, attached (Franklin County Sheriff's Office Letter of Incarceration). While in Franklin County custody, the state charged Mr. Bray with several counts for statutory sodomy or attempted statutory sodomy and child molestation on June 14, 2022 in Case No. 22AB-CR00758-01. PSR ¶¶ 22, 55 (noting arrest from May 25, 2022); Exhibit Q, attached, at p. 1 (docket in *Missouri v. Bray*, 22AB-CR00758-01). Also on June 14, 2022, the state served the warrant on the state indictment while Mr. Bray remained in Franklin County custody. Ex. Q at p. 1.

On August 10, 2022, the grand jury in this District indicted Mr. Bray and he had his initial appearance on August 17, 2022 via a Writ of Habeas Corpus ad Prosequendum ("Writ"). Dkt. Nos. 1, 4, 8. While he moved from Franklin County to a jail contracted with the U.S. Marshals, he was nevertheless still in primary state custody at that time because he appeared here by the Writ. Mr. Bray remained in primary state custody until the Franklin County Judge granted him an O.R. Bond on

8

April 25, 2023.  Ex. Q at p. 3.  As a result, Mr. Bray was in primary state custody for 11 months (from May 24, 2022 until April 25, 2023 or April 26, 2023).

Due to the Writ and Mr. Bray's primary state custody status, the Bureau of Prisons ("BOP") will not grant Mr. Bray credit for this 11-month pre-trial custody period. 18 U.S.C. § 3585(b) (providing defendants do not receive credit for prior custodial time if that time is "credited against another sentence."); Exhibit R, attached, p. 2 (Henry Sadowski, BOP Regional Counsel Northeast Region, *Interaction of Federal and State Sentences When the Federal Defendant is under State Primary Jurisdiction*) ("A federal sentence does not begin to run when a federal defendant is produced for prosecution by a federal writ of habeas corpus ad prosequendum from state custody. . . The sovereign which first arrested the offender [i.e., the state] has primary jurisdiction over the offender, unless that sovereign relinquishes it to another sovereign [i.e., the federal government] by, for example, bail release.").

Recognizing these 11 months of custody results from relevant conduct, PSR ¶ 80, that the BOP will not credit, the parties' Plea Agreement jointly recommends the Court grant an 11-month downward variance.  Dkt. No. 44 at p. 2 ("The parties agree to recommend to the Court that the sentence imposed by the Court provide for an 11-month downward variance to credit the jail time served by the defendant from May 24, 2022 to April 26, 2023."); *see also* PSR ¶ 81.

Because Mr. Bray did not start accruing any federal credit until late April 2023 even though he was arrested and confined nearly a year prior on relevant conduct, this Court should vary by 11 months to account for this lost credit as the parties agree.  And the Court should base this variance from the low-end of Mr. Bray's Guidelines range due to his prior sexual abuse, abusive childhood, his cognitive impairments, the positive strides he made while under state supervision through basically his entire teenage years, and the lack of any adult custody.  Accordingly, the Court should order a sentence of 157 months.

## II. This Court Should Waive the Special Assessment Under 18 U.S.C. § 3014 and Either Waive or Order a Nominal Assessment Under 18 U.S.C. 2259A Because Mr. Bray is Indigent

This Court is required to impose a $5,000 special assessment, but only for "non-indigent" defendants. 18 U.S.C. § 3014. To determine whether a defendant is indigent, this Court must analyze "both a defendant's current financial situation and his ability to pay in the future." *United States v. Barthman*, 983 F.3d 318, 322 (8th Cir. 2020) (internal quotations and citation omitted) (finding defendant was indigent and not subject to the special assessment). Mr. Bray has no assets and nearly $4,000 in debt. PSR ¶ 76. Given his lack of any resources and his debt, this Court should find Mr. Bray is indigent.

Further, Mr. Bray's future job prospects will be limited. As a sex offender with restrictions as to where he can work and the types of jobs he may have, his future employment pool will be narrowed. *See* PSR at pp. 24-26. And given his poor cognitive functioning, his job prospects will likely be limited to lower-pay work. *See* Ex. L. For example, while he held down a job at U-Haul for several years prior to his arrest, Mr. Bray only made $11.22 an hour, which is similar to his pay when he worked in Walmart in Florida. PSR ¶¶ 72, 73.

This Court should, therefore, waive the special assessment based on Mr. Bray's indigency and his limited future earning capacity.

The Court should also either waive or impose a nominal assessment under 18 U.S.C. § 2259A for the same reasons. To impose an assessment under 18 U.S.C. § 2259A, this Court must consider 18 U.S.C. § 3553(a) as well as 18 U.S.C. § 3572 "when ordering this assessment." PSR ¶ 90. For section 3572, the critical subpart, (a)(1)— "the defendant's income, earning capacity, and financial resources," show this Court

should either waive or impose a nominal amount. As discussed above, Mr. Bray has no assets, only debt. PSR ¶ 76. Prior to his incarceration, he barely survived on a job paying $11.22 an hour—less than 10 cents above minimum wage in 2022. As also shown above, his future earning capacity is limited as well.

Accordingly, this Court should waive the special assessment under 18 U.S.C. § 3014 and either waive or impose a nominal amount under 18 U.S.C. § 2259A.

## Conclusion

As argued above, this Court should find a 157-month sentence, which includes an 11-month variance from the low-end of Mr. Bray's Guideline range is sufficient, but not greater than necessary. The Court should further order this sentence run concurrent to Franklin County Case No. 22AB-CR00758-01 because it is relevant conduct. PSR ¶ 80.

The Court should also waive the special assessment under 18 U.S.C. § 3014 and either waive or impose a nominal under 18 U.SC. § 2259A.

Dated: January 18, 2024

                                                      Respectfully submitted,

                                                      /s/ Rachel Korenblat  
                                                      Rachel Korenblat  
                                                      Assistant Federal Public Defender  
                                                      1010 Market Street, Suite 200  
                                                      St. Louis, Missouri 63101  
                                                      Telephone: 314-241-1255  
                                                      Fax: 314 241 3177  
                                                      E-Mail: Rachel_Korenblat@fd.org  
                                                      Attorney for Defendant

## CERTIFICATE OF SERVICE

 Assistant Federal Public Defender Rachel Korenblat certifies that she caused Defendant's Sentencing Memorandum to be filed electronically with the Clerk of the Court, to be served by operation of the Court's electronic filing system upon Assistant United States Attorney, Michael Hayes.

 Dated: January 18, 2024.

                 /s/ Rachel Korenblat